UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARVA HAWKINS,

                Plaintiff,

   -against-

NEW YORK STATE OFFICE OF MENTAL
HEALTH, NEW YORK STATE OFFICE OF
MENTAL HEALTH, ROCKLAND
PSYCHIATRIC CENTER, and, TENEATHIA
WESOLOWSKI, *in her individual and official
capacity*,

                Defendants.

Case No. 17-CV-649 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

     Plaintiff Marva Hawkins ("Plaintiff" or "Hawkins"), proceeding *pro se*, commenced the instant action on January 30, 2017 against New York State Office of Mental Health ("OMH"), Rockland Psychiatric Center ("RPC"), and Teneathia Wesolowski ("Wesolowski") (collectively, "Defendants.") (*See* Complaint, ECF No. 4.)[1] Plaintiff brings five causes of action: (1) retaliation against OMH and RPC under § 740 of New York Labor Law ("NYLL") and § 75-b of New York Civil Service Law ("NYCSL"); (2) retaliation against all Defendants under New York State Human Rights Law ("NYSHRL"); (3) racial discrimination against OMH and RPC under 42 U.S.C. § 1981; (4) hostile work environment and retaliation against OMH and RPC under Title VII; and (5) race discrimination against all Defendants under New York Executive Law. (*Id.* at ¶¶ 88-110.) She seeks reinstatement, damages, and other relief. (*Id.* at 20-21.)

---

[1] Because the Complaint does not clearly state whether Wesolowski is being sued in her personal or official capacity, and Plaintiff is proceeding *pro se*, this Opinion addresses both types of claims.

During discovery, Plaintiff voluntarily abandoned her race discrimination and hostile work environment claims. (*See* Defendants' Memorandum in Support of Summary Judgment, ("Def. Mem."), ECF No. 84 at 2; Plaintiff's Letter Dated Sept. 6, 2018, ECF No. 74; Hawkins Dep. 74:8-11; 97:2-15, ECF No. 90-1.) Thus, Counts 3, 5, and part of 4 are dismissed, and only Plaintiff's retaliation claims are intact.

Presently before the Court is Defendants' Motion for Summary Judgment. (*See* ECF No. 83.) For the following reasons, Defendants' Motion is GRANTED.

## BACKGROUND

The facts below are taken from the parties' Rule 56.1 statements, affidavits, declarations, and exhibits, and are not in dispute, except where so noted. All rational inferences are drawn in Plaintiff's favor.

### Plaintiff's Employment

Around December 2009, OMH hired Plaintiff as an Affirmative Action Administrator ("AAA") at OMH's RPC facility in Orangeburg, New York. AAA's primary job duties were investigating discrimination complaints filed by state agency employees and processing reasonable accommodation requests. Plaintiff's direct supervisor was Marisol Nunez-Rodriguez, the Director of the OMH Bureau of Diversity Planning and Compliance. From July 2015 onward, Nunez-Rodriguez's supervisor was Wesolowski, the OMH Director of Affirmative Action Programs.

Starting in approximately 2013, New York State adopted a uniform process for investigating discrimination complaints at all State agencies, which was overseen by the Governor's Office of Employee Relations ("GOER"). Pursuant to GOER's 10-Step Complaint Investigation Process ("10-Step Process"), the AAA assigned to a case investigates it and

eventually submits a report to the GOER Workforce Development Unit ("WDU"). According to Plaintiff, the draft is always submitted to the AAA's direct supervisor for prior approval.

The 10-Step Process requires AAAs to complete an investigation and submit a draft report within 30 days of the agency's receipt of an employee complaint, or within 10 days if the complaint has been filed with an external body, such as the United States Equal Employment Opportunity Commission ("EEOC") or New York State Division of Human Rights ("DHR"). The parties dispute exactly what the procedure applies when the AAA requires more than the allotted 30 days to complete the case investigation. But they agree that if an AAA requires more time to investigate, the AAA must email WDU before the deadline, request an extension, provide a justification, and propose a new anticipated completion date.

### Plaintiff's Initial Complaint

On October 28, 2015, Plaintiff filed a complaint with DHR alleging, *inter alia,* that GOER and Elaine Bartley ("Bartley"), the Director of WDU, engaged in race discrimination. DHR dismissed this complaint, though the parties dispute the reason. The parties also dispute whether Wesolowski ever learned of this complaint. Regardless, on November 18, 2015, Plaintiff sent a separate email to Wesolowski, accusing her of retaliation, which Wesolowski used to file an official complaint to DHR on Plaintiff's behalf. Neither party disputes that this November email and its concomitant complaint constitute a protected activity.

### Plaintiff's Persistent Performance Issues

Several months before the filing of this official complaint, between May 2015 and November 17, 2015, several individuals from several state agencies reviewed Plaintiff's work, and raised concerns about her work performance and inappropriate responses to supervision. Although Plaintiff claims that she was never informed about any complaints about her work, the record

reflects that OMH began progressive efforts to provide Plaintiff with heightened supervision as early as April 2015, based on these numerous reported deficiencies.

For example, in May 2015, Bartley, then Director of WDU, sent OMH Executive Director Commissioner, Martha Schaefer, emails reflecting her concerns about "issues" with Plaintiff "getting good investigations conducted" and her fear that Plaintiff didn't "understand how to conduct a proper investigation." This same month, Bartley also represented her concerns with Plaintiff's work product, attitude, and insubordination.

Other supervisors also expressed concerns with Plaintiff's work behavior and work quality early on in 2015. For example, on June 23, 2015, Nunez-Rodriguez called Plaintiff to inform her that an email Plaintiff sent to Bartley was considered inappropriate and was therefore documented. Shortly thereafter, Nunez-Rodriguez also notified Plaintiff that she would begin reviewing all of Plaintiff's reports prior to submission to the WDU. The parties dispute whether Plaintiff was told that the reason for this level of review was due to Bartley's concerns about the quality of Plaintiff's investigation reports.

By July 2015, Bartley, who had been reviewing some of Plaintiff's ongoing investigations, noted several glaring issues with them and began circulating her concerns to other supervisors. For example, on July 14, 2015, Bartley sent an email to Nunez-Rodriguez, Schaefer, and others that stated: "I am very disturbed by [a] case [that has been assigned to Plaintiff] and how it has been handled. Marva's report and her investigation are completely unacceptable." Similarly, on September 23, 2015, Bartley sent Wesolowski an email that stated: "We need to meet about Marva's work overall and on this case in particular as soon as possible."

Around this time, Wesolowski, an even higher supervisor of Plaintiff than Nunez-Rodriguez, informed Bartley that because Nunez-Rodriguez's intervention had not improved the

quality of Plaintiff's reports, Wesolowksi would begin personally reviewing Plaintiff's work. Then, on September 24, 2015, Wesolowksi attempted to email Nunez-Rodriguez to request copies of her supervision files regarding Plaintiff's work performance, but Wesolowski inadvertently sent the email to Plaintiff. This upset Plaintiff, who soon thereafter noted that she believed Wesolowski was on a personal vendetta against her.

Nevertheless, Wesolowski's concerns about Plaintiff remained intact, and on September 24, 2015, Wesolowski sent Nunez-Rodriguez an email that stated: "I think Marva needs to understand that as her supervisor and reviewer, you do not find the work up-to-par with her position and level of experience. If you disagree with that statement, please let me know." That same day, Nunez-Rodriguez sent Wesolowski a reply that stated: "I agree. Although, Marva works on the past was good [sic], I have noticed that the quality of her work has declined."

On October 1, 2015, Plaintiff forwarded Wesolowski's inadvertently sent email to another AAA and wrote: "[A]s you can see by this massive error (It was erroneously sent to me), my God is with me and he would never allow my enemies to unjustly triumph over me[.]"

Around this time, Wesolowski took medical leave. But by the end of the month, Bartley told Plaintiff that she planned to set up a meeting to discuss Plaintiff's performance regarding the WDU procedure when Wesolowski returned to the office.

Throughout the month of October, Wesolowski emailed Plaintiff, noting various concerns she had with specific investigations and reports that Plaintiff had produced. Plaintiff responded to each of these emails with hostile language. For example, on October 23, 2015, in response to a request from Wesolowski that she communicate clearly about her cases, Plaintiff sent an email to Wesolowski that stated:

> I have always been very clear and open in my communication. I have never found the need to have interacted with any of my team members in a calculated and

clandestine manner… [I]t is hard for me to comprehend the attempt to present me as a recalcitrant person who had blatantly violated some policy/procedure.

On October 27, 2015, Wesolowski sent Plaintiff an email that stated:

Our communications are intended to help you by providing clarifying, constructive and corrective feedback – not to characterize you, as you term it, 'recalcitrant.' However, your responses read as argumentative and unwilling to accept the feedback… [B]oth Marisol and WDU have been expressing concerns with your work and communications. Therefore, we are attempting to assist you with ironing it out.

On October 28, 2015, Wesolowski sent an email to Nunez-Rodriguez that stated:

As you know, WDU has expressed concerns about Marva with regard to communication, style, investigations, reports and insubordination. You also indicated that you believe the quality of Marva's work has declined, and from what I have observed since returning to OMH, I agree that there are some communications and quality issues that need address.

On October 29, 2015, Nunez-Rodriguez sent Wesolowksi an email that stated:

[B]ased on Elaine's and my interactions with Marva, she has been provided enough guidance and clear directions on what she is expected to do. She was insubordinated [sic] to Elaine and to me. She has been alleging that she does not have clear directions from WDU as an excuse for underperformance. Of all our AA staff, she is the only one stating or alleging that the lack of guidance from WDU is affecting her work.

The same day, Wesolowski, sent an email to Nunez-Rodriguez that stated: "I will re-review the emails, so we can work on the counseling memo and performance plan." Alas, on November 5, 2015, Wesolowksi sent an email to then-OMH Agency Labor Relations Representative Daniel Ragone that requested his advice about how to address the issues with Plaintiff's performance and suggested that a performance improvement plan might be necessary.

Throughout November 2015, Plaintiff continued to show hostility to receiving feedback and sent a series of emails to Wesolowski accusing Wesolowski of trying to "malign" her and stating: "I don't argue with people because I was not raised in a dysfunctional home and I do not reside in one." Yet, separately, on November 17, 2015, Lauren Axelrod, an attorney at New York

6

Empire State Development ("ESD"), called Wesolowski and stated that when Plaintiff had been assigned to investigate ESD cases, her work had been "marginally acceptable" and "useless" and requested that Plaintiff never be assigned to conduct investigations for ESD ever again.

On November 17, 2015, Bartley sent Nunez-Rodriguez and Wesolowski an email that stated she had "a great deal of concern with Marva's work" because her report on one case was five months late and she had "conclude[d] that the allegation is substantiated without knowing whether there was a promotional opportunity available, what the decision making process is for such promotions, whether the appts office has to be involved, etc." In essence, Bartley again found Plaintiff's report error-laden and sub-par.

**Continuing Issues with Plaintiff's Work Performance After Protected Activity**

Throughout November 2015, Plaintiff's supervisors continued asking Plaintiff about the status of several reports that were overdue. But Plaintiff's timeliness and feedback issues persisted. For example, on December 8, 2015, Bartley sent an email to Schaefer that stated:

> Marva cannot accept any feedback. We had asked her to complete this investigation timely (which was by 11/15) and she made multiple excuses about why she could not get it done. She is the only AAO who routinely delivers her investigations months late, fails to request extensions, misspells parties' names, and never accepts feedback. Her behavior is unacceptable.

Plaintiff continued, however, to turn in investigations late. She also continued to be hostile in her emails to supervisors. On January 22, 2016, Plaintiff sent an email to Wesolowski that stated:

> Unfortunately, you have not provided any useful information in the review of my cases. You have only caused confusion and delay in the cases being completed because you frequently provide the AAA's with directives that conflict with Marisol's and the GOER 10-step process…. With her 30+ years of experience, I am confident Marisol is able to provide me with any needed assistance.

Despite all of Plaintiff's excuses, third party dissatisfaction with Plaintiff's work quality continually surfaced. Hence, on January 29, 2016, Bartley sent Wesolowski an email stating that

one of Plaintiff's draft reports "makes no sense" and noting that it was "[v]ery confusing and concerning that … it took [Plaintiff] more than 4 months to complete this unclear report." Plaintiff's only responses to such critiques were unrelated excuses and sources of blame. For example, throughout the beginning of February, Plaintiff continually commented about the lack of positive contributions that she believed Wesolowksi and/or other supervisors were making in the office. On February 4, 2016, Plaintiff went so far as to send Wesolowski, Schaefer, and Nunez-Rodriguez an email speculating that "[p]erhaps, Marisol's culture is a barrier to her speaking up."

On February 8, 2016, Barley sent an email to Plaintiff and Nunez-Rodriguez stating that Plaintiff's latest report was "replete with errors, including spelling the complainant's name (a male, [RM]) different ways throughout the report (even in the same paragraph), referring in one paragraph to the complainant as 'she' and 'Ms.' And … [e]ven more troubling is that the complainant did not allege discrimination against him…." Bartley's email stated:

> [B]ecause the reports that I have reviewed from Marva have required substantial feedback from me over the past year, I reviewed this one to see if there has been improvement in the accuracy of the reports or if my suggestions in prior reports had been incorporated going forward. They have not. I am really at a loss at this point – it is pointless to revise this report, as from the outset, this was not a complaint of discrimination, but I feel compelled to point out that last week was Groundhog Day and I keep seeing the same problems with these draft reports over and over again.

On February 12, 2016, Nunez-Rodriguez and Ragone held a formal meeting with Plaintiff during which Plaintiff was given a written counseling memorandum related to her performance issues. Plaintiff was also informed that she was being placed on a three-month long performance improvement plan to improve her responsiveness, work quality, and timeliness. Plaintiff did not believe that her work performance required improvement in any of the areas noted.

### Continuing Issues with Plaintiff's Work and Insubordination

In March 2016, Wesolowski sent Plaintiff several emails asking about the status of various drafts that Plaintiff submitted. Plaintiff disputes whether her responses to these emails were contentious. That same month, Plaintiff sent a new complaint to WDU without the prior review of Nunez-Rodriguez. Despite now arguing that all complaints required prior supervisor approval before submission to the WDU, Plaintiff claims that she was never told that Nunez-Rodriguez had to review her notice of complaint. When Nunez-Rodriguez then expressed her concern that Plaintiff did not follow her instructions, Plaintiff denied that Nunez-Rodriguez had instructed her to seek approval prior to sending them to WDU.

On April 15, 2016, nearly a month after the 30-day deadline for the report in one particular case, Plaintiff sent WDU an email requesting an extension and claimed that she was instructed that no report was needed. Plaintiff's request for an extension on this case was denied, and on April 18, 2016, Bartley sent an email to Nunez-Rodriguez, Wesolowski, and Schaefer, stating that she was concerned about Plaintiff's "continuing failure to act as instructed, lying about it, and failure to comply with the 10-step process."

The next month, on May 11, 2016, Plaintiff sent Nunez-Rodriguez an email in which she refused to implement Wesolowski's edits on a draft report. Plaintiff claims that her refusal to implement the edits was because she was confused about to what Wesolowski was referring. During this general time, Plaintiff and Wesolowski went back and forth about various proposed edits and Plaintiff's proffered reasons for not implementing them.

**Termination**

On June 15, 2016, Nunez-Rodriguez sent Wesolowski and Ragone an email summarizing the results of the performance improvement plan and concluding that Plaintiff had "failed to meet the standards established in the [performance improvement plan] of February 12, 2016. On July 28, 2016, Nunez-Rodriguez and Ragone met with Plaintiff and informed her that OMH was terminating her employment. Plaintiff claims that during this meeting, Ragone was the only one who spoke to her and told her that her employment was being terminated. Although Wesolowski had been involved in assessing Plaintiff's performance in the months leading up to Plaintiff's termination, Wesolowski was on medical leave from approximately July 18, 2016 through September 7, 2016 and did not participate in the meeting. No one at OMH ever told Plaintiff that an adverse action occurred to her because her complaints about racial discrimination.

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden,

the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009). Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Id*. at 249. Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id*. at 250. Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Critically, in an opposition to a motion for summary judgment "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

When dealing with summary judgment motions in *pro se* cases, courts in this Circuit must "read the pleadings of a *pro se* plaintiff liberally and "raise the strongest arguments that they suggest" *McPherson v. Coombe*, 17 F.3d 276 (2d Cir. 1999) (*quoting Burgos v. Hopkins*, 214 F.3d.787, 790 (2d. Cir. 1994)). Pleadings drafted by *pro se* plaintiffs moving for summary

judgment are not held to the same "stringent standards" as "formal pleadings drafted by lawyers." *Shariff v. Poole*, 689 F.Supp.2d 470, 476 (S.D.N.Y. January 20, 2010). On the other hand, *pro se* plaintiffs cannot overcome a motion for summary judgment by simply making "bald" assertions that are unsupported by the evidence. *Id.*

## DISCUSSION

Defendants raise several arguments that stem from facts adduced during discovery as well as conclusions they argue are warranted as a matter of law. The Court begins with the claims that must be disposed as a matter of law and then turns to Plaintiff's remaining claims.

### Claims that Fail as a Matter of Law

Defendants first argue that several of Plaintiff's claims fail as a matter of law because OMG and RPC are New York State agencies and Wesolowski is a State employee. (Def. Mem.at 11.)

The Court agrees with Defendants that RPC and OMH are considered agents and instrumentalities of the New York State. *See Henny v. New York State*, 842 F. Supp. 2d 530 (S.D.N.Y. 2012). Therefore, regarding Plaintiff's NYLL Section 740 claim against OMH and RPC (in Count 1), the Court finds that this state law does not apply to public employers. *Dibiase v. Barber*, No. CV 06-5355, 2008 WL 4455601, at *5 (E.D.N.Y. Sept. 30, 2008) ("Section 740 pertains only to employees in the private sector and [ ] its public employee counterpart is New York Civil Service Law § 75-b…"); *Tamayo v. City of New York*, No. 02 CIV. 8030(HB), 2004 WL 137198, at *7 (S.D.N.Y. Jan. 27, 2004). Plaintiff does not dispute this. Accordingly, Plaintiff's NYLL Section 740 claim is dismissed as a matter of law.

Next, regarding Plaintiff's NYSCSL Section 75-b retaliation claim against OMH and RPC (also in Count 1), Defendants argue that this claim is barred by the Eleventh Amendment. (Def. Mem. at 11.) Plaintiff disputes this argument in part, noting that while Sovereign Immunity

protects OMH and RPC from claims for civil damages, it does not immunize them from prospective injunctive relief. (*See* Plaintiff's Opposition to Summary Judgment, ("Pl. Opp."), ECF No. 93 at 8-9.) Defendants concede so much, and the Court agrees. Accordingly, any claims for monetary damages from OMH, RPC that Plaintiff brings under New York Civil Service Law Section 75-b are dismissed as a matter of law as well. Plaintiff's claims for injunctive relief survive.

Lastly, the Court agrees with Defendants that Plaintiff's NYSHRL retaliation claim against OMH, RPC, and against Wesolowski in her official capacity (in Count 2) need be dismissed as a matter of law to the extent that Plaintiff seeks money damages. *Lambert v. New York State Office of Mental Health*, No. 97-cv-1347, 2000 WL 574193, at *7 (E.D.N.Y. Apr. 24, 2000) ("As district courts in this Circuit have uniformly found, the New York Human Rights Law includes no waiver of the state's immunity to suit in federal court."); *Sutherland v. New York State Dep't of Law*, No. 96-cv-6935, 1999 WL 314186, at *5 (S.D.N.Y. May 19, 1999) ("A suit against a state official in his or her official capacity … is the equivalent of a suit against the state itself."). Thus, as with the claims in Count 1, these claims are dismissed as a matter of law to the extent that they seek any money damages.

In sum, Plaintiff's surviving claims are for Title VII retaliation against OMH and RPC (Count 4), NYSHRL retaliation against Wesolowski, in her individual capacity, and NYSHRL retaliation against Wesolowski in her official capacity, to the extent that Plaintiff seeks injunctive relief (Count 2.)

### Legal Standard for Retaliation Claim

Title VII and NYSHRL retaliation claims are both analyzed under the *McDonnell Douglas* burden-shifting framework. *Battacharia v. Pernod Ricard USA*, LLC, No. 13-cv-7222 (NSR), 2015 WL 4879204, at *11 (S.D.N.Y. Aug. 13, 2015). Under this framework, to establish a *prima*

*facie* case of retaliation, "a plaintiff must show: '1) participation in a protected activity' 2) the defendant's knowledge of the protected activity and the adverse employment action; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action.'" *Id.* (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013)); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 89 (2d Cir. 2015).

If the plaintiff establishes a *prima facie* case, "the burden shifts to the employer to articulate some legitimate non-retaliatory reason for the employment action." *Battacharia,* 2015 WL 4879204, at *11. "If the defendant fails to meet this burden, the presumption falls away and the plaintiff must offer evidence demonstrating that the non-retaliatory reason is merely a pretext for retaliation." *Id.*

To defeat summary judgment, the plaintiff must "show that the 'retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision.'" *Id.* (quoting *Zann Kwan*, 737 F.3d at 845). This requires that the plaintiff set forth evidence showing "'that the adverse action would not have occurred in the absence of the retaliatory motive.'") *Id.* (quoting *Zann Kwan*, 737 F.3d at 846). Where a plaintiff attempts to use temporal proximity to establish causation, as Plaintiff does here, the "temporal proximity must be 'very close'" to establish causation. *Garcia v. Yonkers Bd. of Educ.*, 188 F. Supp. 3d 353, 360 (S.D.N.Y. 2016) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

**Plaintiff's Retaliation Claims Fail to Raise Triable Issues**

To begin, the parties do not dispute that Plaintiff engaged in a protected activity when, on November 18, 2015, Plaintiff emailed Wesolowski, accusing her of retaliating against Plaintiff—and the next day, Wesolowski submitted that email along with a discrimination complaint to OMH on Plaintiff's behalf. *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, No. 18-CV-00494 (NSR),

2019 WL 4039149 (S.D.N.Y. Aug. 27, 2019) ("It is undisputed that '[i]nformal complaints to supervisors,' instituting litigation, [and] filing a formal complaint are protected activities under Title VII.") (quoting *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014)). There is also no dispute that OMH and Wesolowski knew about Plaintiff's retaliation complaint as of November 2015. Plaintiff thus satisfies the first two *prima facie* elements for retaliation.[2]

The parties also do not dispute that termination that is a product of retaliation suffices as an adverse employment action, as "[u]nder Title VII, the definition of an 'adverse employment action' is broad." *Id*. Therefore, as both parties have recognized, the crux of the case is whether the factual record, construed in the light most favorable to Plaintiff, raises a triable issue of fact that retaliation was the but-for cause of Plaintiff's termination.

The Court finds that the record does not sufficiently support such causation for several reasons. First, Defendants correctly note that Plaintiff's retaliation claim is based entirely on timing. (Hawkins Dep. 95:696:25; 191:25-195:5). And "[w]here a plaintiff attempts to use temporal proximity to establish causation, the "temporal proximity must be 'very close.'" *Id*. (citing *Garcia.*, 188 F. Supp. 3d at 360; *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. at 273). Further, the Second Circuit has held that "[w]here timing is the only basis for a claim of retaliation and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance* Am Corp., 248 F.3d 87, 95 (2d Cir. 2001).

---

[2] Although Plaintiff had filed a different complaint about race discrimination by different entities about a month earlier, the record does not support that OMH, RPC, or Wesolowski knew about it. Further, even if they had wind of Plaintiff's previous complaint from the month before, such knowledge would not overcome the glaring deficiencies relating to timing and causation in the instant case. Similarly, as far as any subsequent complaints that Plaintiff made, none of them can support Plaintiff's claim for retaliation, as no subsequent complaints can cure the defect Plaintiff has with showing that her progressive supervision related to her ongoing performance issues that began in April and May 2015.

The record here shows ample proof that the heightened review of Plaintiff's work, increased counseling, creation of a performance improvement plan, and Plaintiff's termination— were all part of a continual and ongoing investigation that began due to multiple recommendations several months before Plaintiff engaged in in protected activity. For example:

- On **April 8, 2015,** Elaine Bartley, the Director of WDU, emailed Plaintiff pointing out parts of Plaintiff's report that needed improvement, such as the credibility analysis of witnesses, which was entirely lacking, and the need to have a timeline that served a purpose instead of one with nothing in it. (*See* Bartley email Dated 4/8/19, Hawkins Dec. Ex. 9, ECF No. 95-9; Bartley Dec. ¶¶ 10-11, ECF No. 86.)

- On **May 6, 2015**, Elaine Bartley raised further concerns about Plaintiff's work product and insubordination with other staff members when she sent OMH Executive Director Commissioner Martha Schaefer an email to that effect. (*See* Bartley Dec. ¶ 16; Bartley email chain dated 5/6/2015, ECF No. 86-8.)

- Later that same month, on **May 21, 2015**, Bartley sent another email to Schaefer that stated:

    > I think we need to discuss Marva Hawskins's work product, attitude, and/or insubordination and Marisol's apparent failure to supervise her. Marva apparently does not feel that it is her obligation to investigate these complaints properly or to seek out information requested of her, whether requested by this office or her supervisor. (Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21.)

- On **June 23, 2015**, Plaintiff's immediate supervisor Nunez-Rodriguez, called Plaintiff to inform her that a response she sent to Bartley was inappropriate and documented that she related this to Plaintiff. (Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22.)

- One day later, on **June 24, 2015**, Nunez-Rodriguez notified Plaintiff that she would begin reviewing all of Plaintiff's reports prior to submission to the WDU. (*See* Conroy Dec., ECF No. 90-6.)

- At this point, Plaintiff was aware that that there were already individuals from different agencies, about whom she had not filed any complaints, who were reviewing her work product for quality concerns. Indeed, in response to Nunez-Rodriguez's email, the next day, Plaintiff asked if she had been "relegated to a Person in Need of Supervision." (*See* Conroy Dec., Email Dated 6/25/15, ECF No. 90-6.)

- On **September 23, 2015**, Nunez-Rodriguez's supervisor, Teneathia Wesoloski, (the third separately named individual to actively seek review of Plaintiff's work for quality-assessment) informed Bartley that because Nunez-Rodriguez's intervention had not improved the quality of Plaintiff's reports, Wesolowski would begin "personal reviews" of Plaintiff's work. (*See* Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27.)

- By accident, the next day, Wesolowski emailed Plaintiff and not Plaintiff's direct supervisor Nunez-Rodriguez, an email stating: "I would like to review your supervision files and any documentation you have regarding work performance for Plaintiff." (*See* Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28.)

- That same day—**September 24, 2015**—still well-before Plaintiff had filed any complaint of discrimination or retaliation against Nunez-Rodriguez or Wesolowski, Nunez-Rodriguez replied to Wesolowski that she agreed that a qualitative review of Plaintiff's work product was necessary, stating: "I agree. Although, Marva works on the past was good [sic], I have noticed that eh quality of her work has declined." (*See* Def. 56.1 ¶ 31; Pl. 56.1 ¶ 31.)

The record thus shows that at least three to five different supervisors who reviewed Plaintiff's work-product believed that it was sub-par, regardless of her work performance in earlier years, and began reviewing and monitoring it as early as April and May of 2015. And throughout, Plaintiff's performance review, they raised concerns about Plaintiff's work quality, such as lack of clarity, lack of attentiveness, and timeliness. (*See* Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44) (relating that Lauren Axelrod, an attorney at New York Empire State Development called Wesolowski and stated that when Plaintiff had been assigned to investigate ESD cases, her work had been "marginally acceptable" and "useless" and requested that Plaintiff never be assigned to investigations for ESD ever again); (*See* Email from Bartley Dated 1/29/16) (explaining that one of Plaintiff's draft reports "makes no sense" and noting that it was "[v]ery confusing and concerning that … it took [Plaintiff] more than 4 months to complete this unclear report." ); (*See* Owen Conroy Dec., ECF No. 90-2) (discussing how Plaintiff continually asked for extensions of time despite uniform policy of investigations needing to be completed within 30 days.); (*See* Email from Paul Francis, ECF No. 95-23) (discussing how OMH had worked with Hawkins extensively over several months in an effort to help her meet their performance expectations without success); (*See* Email to Daniel Ragone dated 11/5/19, ECF No. 88-1) (describing how Plaintiff's work performance was getting worse, her insubordinate behavior was increasing, and her emails were

sounding more hostile with various supervisors); (*See* Email from Bartley to Nunez-Rodriguez dated 7/14/19, ECF No. 86-11) (reflecting that "Marva's report and her investigation are completely unacceptable.")

The record also reflects that once Plaintiff got wind of the fact that her work was being closely monitored, she became increasingly hostile in her email communications with her supervisors. For example:

- On **October 1, 2015**, Plaintiff forwarded Wesolowski's inadvertently sent email to another AAA and wrote: "[A]s you can see by this massive error (It was erroneously sent to me), my God is with me and he would never allow my enemies to unjustly triumph over me[.]" (*See* Conroy Dec., Email Dated 10/1/2015, ECF No. 90-5.)

- Then on **October 23, 2015**, in response to an email she received the day before, in which Bartley and Wesolowski indicated that they would like to set up a meeting to discuss Plaintiff's performance with her, Plaintiff responded:

   "I have always been very clear and open in my communication. I have never found the need to have interacted with any of my team members in a calculated and clandestine manner… [I]t is hard for me to comprehend the attempt to present me as a recalcitrant person who had blatantly violated some policy/procedure."

(*See* Def. 56.1 ¶ 34; Pl. 56.1 ¶ 34.)

Thus, throughout October, the record shows that Plaintiff already believed that her supervisors were "enemies" who were trying to "unjustly triumph over [her]" and "present [her] as a recalcitrant person who had blatantly violated" workplace conduct. Regardless of Plaintiff's reaction, Wesolowksi and Nunez-Rodriguez continued trying to assuage Plaintiff's anxieties and assure her that they were not trying to mar her reputation, but rather improve her performance.

Yet because Plaintiff continued with her hostile accusations in her emails, in October and November, Wesolowski and Nunez-Rodriguez began discussing the need for a formal counseling session with Plaintiff and the need to set her up on a performance improvement plan. In the context of these discussions, Wesolowski and Nunez-Rodriguez noted ample examples of specific cases

in which Plaintiff had either missed deadlines, missed glaringly relevant evidence or completely misinterpreted the relevance of factual developments that were detrimental to her completing her reports accurately and adequately. (*See* Counseling Memorandum Dated February 12, 2016, ECF No. 88-2) (listing out issues with at least six different investigations in which Plaintiff demonstrated persistent investigatory inadequacies).

Plaintiff nevertheless continued believing in her theories, and two weeks before she made her November 18, 2015 accusation against Wesolowski, she sent an email to a colleague accusing Wesolowski of having "pure unadulterated ego" and threatening: "you know what they say .... 'Pride goeth before the fall.'" (Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41.) Despite Plaintiff's emails, accusations, and finally her complaint, Wesolowski and Nunez-Rodriguez continued monitoring the status of the same investigations that they had been analyzing before Plaintiff's complaints, attempting to see if Plaintiff had improved her reports and investigations. As of December 2015, however, they still believed that Plaintiff's reporting and work performance was drastically lacking. (*See* Bartley Dec. ¶¶ 39-41, ECF No. 86, 86-19.)

By the end of January, the record reflects that Plaintiff's supervisors were still complaining about Plaintiff's issues with timeliness and thoroughness, and Plaintiff was still arguing about their attitude and vendetta against her. For example, on January 22, 2016, Plaintiff sent an email to Wesolowski that stated:

> Unfortunately, you have not provided any useful information in the review of my cases. You have only caused confusion and delay in the cases being completed because you frequently provide the AAA's with directives that conflict with Marisol's and the GOER 10-step process…. With her 30+ years of experience, I am confident Marisol is able to provide me with any needed assistance.

(*See* Def. 56.1 ¶ 49; Pl. 56.1 ¶ 49.)

In response to this email, on January 29, 2016, Bartley told Wesolowksi that Plaintiff's reports continued to make no sense and were "very confusing" and that that it was concerning that it was taking Plaintiff more than 4 months to complete such inadequate reports in the first place. (*See* Email chain from January 29, 2016, ECF No. 86-20.) Even in February, Plaintiff continually commented about the problems that she believed Wesolowksi and/or other supervisors were making in the office, which she attributed to her performance issues.

Most ironically, on February 4, 2016, Plaintiff sent Wesolowski, Schaefer, and Nunez-Rodriguez an email speculating that "[p]erhaps, Marisol's culture is a barrier to her speaking up" about the perceived dispute between Plaintiff and Wesolowki. Plaintiff still saw no issue with the fact that all emails about her performance related to the lack of timeliness and thoroughness in her work product. Yet all the emails she sent out related to her supervisors' personalities, culture, or supposed biases against her.

Finally, after being told in mid-February that Plaintiff would be placed on a three-month long performance improvement plan, in March 2016, Wesolowski sent Plaintiff several emails asking about the status of various drafts that Plaintiff submitted to which Plaintiff continued to reply with hostility. (*See* Wesolowski Dec. ¶¶ 26- 34, 42, 43, 46.) In April, Plaintiff continued to ask for extensions and refused to implement changes in her reports that were being directed by her supervisors. (*See id.* ¶¶ 30, 31, 32, 45, 57.)

By the time the decision was made to fire Plaintiff, it was June 2016, which was over a year after several of Plaintiff's superiors had engaged in a prolonged review of her work-product and behavioral issues. It was also after Plaintiff's full three-month long performance improvement plan had been implemented. The record reflects that Plaintiff's supervisors deliberated whether they felt there was any meaningful improvement despite the implementation of the plan and why

they concluded that there was not. (*See* Email from Paul Francis, ECF No. 95-23) (discussing how OMH had worked with Hawkins extensively over several months in an effort to help her meet their performance expectations without success and with consistent deficiencies documented).

While Plaintiff attempts to cite a Third Circuit case to support that "an intervening pattern of antagonism is sufficient to support a claim of retaliation," *Robinson v. Se. Pennsylvania Transp. Auth., Red Arrow Div*., 982 F.2d 892 (3d Cir. 1993), the record does not support that there was ever any *intervening* pattern of antagonism to which Plaintiff was subjected. The momentum behind Plaintiff's performance review commenced before her initial complaints and continued throughout the year. Such timing does not support causation. *See Wang v. Palmisano*, 157 F. Supp. 3d 306, 327 (S.D.N.Y. 2016); ("where even very close temporal proximity exists, the requisite causal connection will falter if the employer's complained-of conduct began before the employee's corresponding protected activity"); *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 456 (S.D.N.Y. 2013) ("Although temporal proximity can sometimes demonstrate a causal nexus, where (as here) the termination was ultimately the product 'of an extensive period of progressive discipline' that began . . . three months before the [protected activity], a claim for retaliation cannot be maintained."), *aff'd sub nom., Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014); *White v. Eastman Kodak*, No. 06–CV–6493, 2009 WL 1514659, at *10 (W.D.N.Y. May 29, 2009) (where "discipline was already underway prior to the protected activity . . . temporal proximity alone is insufficient to make out a prima facie case").

Accordingly, as the record fully reflects that Plaintiff's protected activity came in response to the heightened supervisory measures and none of the supervisory measures were on the heels of her protected activities, the timing in this instance does not support the "requisite causal connection" necessary to sustain a retaliation claim under city, state, or federal law.

**Defendants Had Legitimate, Non-Retaliatory Reasons to Terminate Plaintiff**

In addition, the Court finds that Defendants had legitimate, non-retaliatory reasons for all of Plaintiff's alleged adverse actions. First, the Court notes that the *McDonnell Douglas* analysis is "not a particularly steep hurdle," and the Court may not "second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory." *Hirschberg v. Bank of Am., N.A.*, 754 F. Supp. 2d 500, 511 (E.D.N.Y. 2010). More importantly, in this case, as discussed above, there is abundant undisputed evidence supporting OMH's decision to subject Plaintiff to increasing levels of heightened supervision, counseling, a performance improvement plan, and eventually termination based on a legitimate non-discriminatory reason, namely her sub-par investigative capacity, inability to meet deadlines, and difficulty with harmonious communication.

The record reflects that there were at least six investigations to which Plaintiff was assigned in which Plaintiff's supervisors believed that Plaintiff's analysis and comprehension of relevant incidents fell below the mark. (*See* Elaine Bartley Dec., ECF No. 86 at 11-17.) Further, as already discussed, the record reflects an abundance of emails in which Plaintiff's tone in emails and accusations about her supervisors being "enemies" with "vendettas" against her or having biases based on "culture" demonstrate that Plaintiff's employer had several legitimate bases for deciding to terminate Plaintiff.

**Plaintiff Has not Demonstrated Pretext**

While Plaintiff conclusorily states that her employer's proffered reasons for terminating her were pretextual, Plaintiff has not offered one iota of proof that her supervisors/employer ever discussed her complaints about race discrimination or her complaint about retaliation, let alone that her complaints about either factored into the many ongoing decisions to analyze her work performance and ultimately terminate her.

Indeed, the record shows just the opposite. Regarding her earliest complaint, from October 28, 2015, related to race discrimination by DHR and Bartley, there is no proof that this claim was ever deemed colorable or (more importantly) that Bartley, Wesolowski, or OMH ever knew about it. Regarding her second complaint, which was officially filed by Wesolowski, in which Plaintiff accused Wesolowski of retaliating against Plaintiff, not one email correspondence shows Wesolowski even reacting to this complaint, other than the one in which she decided to take the affirmative step of using the email to file an official complaint on Plaintiff's behalf.

From all the emails and exchanges that were produced during discovery, Plaintiff was unable to find even one that showed discriminatory or retaliatory animus. In fact, Plaintiff admitted herself that she did not believe anyone harbored any discriminatory bias against her (*See* Hawkins Dep. at 74:11, ECF No. 90-1.)

To the extent that Plaintiff claims her supervisors knew she felt retaliated against for a long time, (*see* Hawkins Dec. ¶¶ 55, 74, 83-88, 142), Plaintiff's own self-serving statements, in her affidavits, memoranda, and deposition are simply insufficient to overcome her burden of proof to survive summary judgment, as they are all self-serving statements uncorroborated by any additional evidence. *See Fincher v. Depository Trust & Clearing Corp.,* No. 06 Cv. 9959, 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) *aff'd*, 604 F.3d 712 (2d Cir.2010) ("A [nonmoving party's] self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment."); *Orisek v. Am. Inst. Of Aeronautics & Astronautics*, 938 F.Supp. 185, 191 (S.D.N.Y. 1996), *aff'd*, 162 F.3d 1148 (2d Cir. 1998) (finding that a plaintiff's own disagreement with her employer's perceptions of her job performance does not satisfy her burden of showing that the [employer's] proffered justification as a pretext for discrimination."); *Mavrommatis v. Carey Limousine Westchester, Inc.*, 476 F.App'x 462, 466 (2d

Cir. 2011) (holding that even a "positive performance evaluation" does not establish that employer's action was pretext where employer "provided evidence showing that [plaintiff] had numerous job performance issues.").

The Court has already discussed the many legitimate issues that arose with Plaintiff's work product over the span of her investigation. The Second Circuit has explained that it is not pretextual for an employer to terminate an employee for failure to complete reasonable expectations of their job. *Slattery*, 248 F.3d 87 ("Neither this court not a jury may determine on these facts that a requirement for a new business representative to produce at least some new business over a two year period is unreasonable and therefore must be pretextual."). Plaintiff's investigations were repeatedly sub-par, and they were the core component of her job.

Accordingly, Plaintiff has not met her burden of proof to show that her employer's proffered reasons for terminating her were pretextual.[3]

### Plaintiff's Other Complaints are Not Adverse Employment Actions

Plaintiff complains about a host of instructions given to her by her supervisors that she felt were onerous and unnecessary. For example, Plaintiff complains about: being reprimanded for the information she includes on her Outlook calendar, being reprimanded about what details she was supposed to include in her investigative reports, being assigned to projects that required her to travel, and being scolded in emails in which she was supposed to include Wesolowski. (*See* Hawkins Dep. At 47, 97-98, 54-56, 194.)

But as Defendants correctly note, to qualify as an adverse employment action, the challenged action must be "materially adverse, which in this context means it well might have

---

[3] The Court also notes that while the evidence produced a single satisfactory job review by Janet Monroe, Monroe admitted that she "had no role in reviewing or supervising Plaintiff's investigations work." (*See* Janet Monroe Dec., ECF No. 89.) For this reason, amongst the others, this satisfactory job review does not create a triable issue of fact related to areas in which Plaintiff's job performance was lacking.

dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Davis-Garrett v. Urban Outfitters, Incorporated*, 921 F.3d 30, 43-44 (2d Cir. 2019) (finding that courts will look at "whether the [alleged adverse action] to which [the plaintiff] was subjected could well have dissuaded a reasonable employee" from "complaining of unlawful discrimination."); *Carter v. New York*, 310 F. Supp. 2d 468, 479 (N.D.N.Y. 2004) (explaining that an "adverse employment action" must lead to a "materially adverse change.").

While the conduct of which Plaintiff complains could be considered adverse in a dignitary sense, none of it rises to the level where a trier of fact could find that it would have dissuaded a reasonable employee from complaining about discrimination or retaliation. *See id*. Accordingly, Plaintiff's other complaints are not cognizable adverse employment actions, and Plaintiff has not produced enough evidence to support a *prima facie* claim for retaliation against any Defendants.

## CONCLUSION

For the reasons discussed, Defendants' Motion for Summary Judgment is GRANTED in its entirety. All claims in this action against all Defendants are hereby dismissed. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 83, terminate the case, and enter judgment in favor of Defendants. The Clerk of the Court is additionally directed to mail a copy of this order to Plaintiff at her known address on ECF and show proof of service on the docket.

SO ORDERED.

Dated:     September 19, 2019
           White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge